OPINION OF THE COURT
Thomas J. Lowery, Jr., J.
These timely filed negligence claims were brought against the State of New York for personal injuries sustained when the claimant, Kenneth R. Nelson, lost control of his vehicle after encountering an accumulation of water on a section of Route 89, north of the City of Ithaca, Tompkins County, New York.
FACTUAL BACKGROUND
The accident occurred shortly before 2:00 P.M. on August 14, 1977. The claimants were returning to their home in Waterloo, New York. Kenneth R. Nelson was operating his 1970 Plymouth station wagon in a northerly direction on State Route 89. His wife, Gloria, was seated beside him and two of his children were lying down in the rear of the car. Route 89 was a two-lane undivided macadam highway. Pavement markings separated the opposing lanes. Mr. Nelson was generally familiar with the highway, having driven over it four to five times a year since 1970. No evidence was presented, however, that he had driven over the highway when it was raining. Just south of the accident site, Mr. Nelson encountered heavy rain.[1] At this point, the road *109 commenced a downhill grade. Mr. Nelson reduced his speed to approximately 40 miles per hour and proceeded down the hill. Near the bottom of the hill the road curved to the left. As he rounded the curve, Mr. Nelson heard a splashing of water. His vehicle drifted to the left, approximately one to two feet over the center line. He then observed a southbound vehicle approaching, 100 to 300 feet away and attempted to steer his vehicle back into the northbound lane. His automobile did not respond. He then turned his wheel further to the right. His steering control then abruptly returned and his vehicle was propelled sharply to the right, whereupon it spun around, left the east side of the highway, struck a utility pole, and was demolished.
The highway was constructed in 1932. A macadam overlay was placed on the road surface in 1956. The hill south of the accident site was 3,700 feet in length and had a relatively steep grade of 6.3%. Approximately 400 feet south of the utility pole struck by the Nelson vehicle, the steepness of the grade began to diminish. The low point in the road was some 150 feet south of the aforesaid pole. From here the road commenced a very slight upgrade towards the pole. The left-hand curve in this area commenced approximately 650 feet south of the pole. This curve had a radius of 2,292 feet and had 2.5 degrees of curvature. There existed very little superelevation on the curve. That which did exist, fluctuated from a slight positive to a slight negative reading over the course of the curve. On the hill, south of where the curve began, tire tracks were worn in the macadam surface of the northbound lane for a distance of 900 feet. These ranged in depth from one eighth to three eighths of an inch. At the time of the accident, the only warning signs in place were a standard hill and curve sign. The speed limit in the area was 55 miles per hour.
During periods of rain, water was collected in the tire tracks and was channeled down the hill. Due to the lack of *110 superelevation along the curve, and the low point in the road, water would accumulate in the northbound lane. The standing water covered the northbound lanes for a distance of approximately 200 feet, commencing at a point 100 feet south of the utility pole struck by the Nelson vehicle, to a point 300 feet south of the pole. It was within this area that the claimant, Kenneth R. Nelson, lost control of his vehicle.
The accumulation of water in this area had been observed over a period of several years prior to the Nelson accident. This condition was not readily observable to northbound motorists. Other vehicles had experienced similar difficulties, when encountering the standing water.[2] Because of the recurrence of the condition and the accidents that were observed, Charles E. Houghton, a resident of the area, personally complained to the State’s resident engineer in 1974. Moreover, it is noted that Mrs. Lillias Hinshaw, another resident of the area, also informed the State’s resident engineer of the condition of the road surface and the accidents that were being caused as a result. This report was apparently incidental to a complaint concerning a drainage problem in her driveway. In response to the latter complaint, the State’s resident engineer visited the scene. As a result of this visit, certain corrective action was taken. This consisted of placing a swale in front of the Hinshaw property, some 300 to 400 feet south of the aforesaid utility pole. Although this somewhat corrected the drainage problem in the driveway, it tended to cast additional water north onto the highway. No remedial action was taken to prevent the accumulation of water on the highway, nor were any warning signs placed to warn motorists of the danger.
Liability
 It is the general rule that the State is under a duty to construct and maintain its highways in a reasonably safe *111 condition. (Lopes v Rostad, 45 NY2d 617; Boyce Motor Lines v State of New York, 280 App Div 693, affd 306 NY 801.) Where existing conditions have rendered the highway unreasonably dangerous, the State must correct or warn against the danger if it had a reasonable opportunity to do so. (Hicks v State of New York, 4 NY2d 1; McDevitt v State of New York, 1 NY2d 540; Stuart-Bullock v State of New York, 38 AD2d 626, affd 33 NY2d 418.) Violation of this duty constitutes negligence (Canepa v State of New York, 306 NY 272; Eastman v State of New York, 303 NY 691; Van de Walker v State of New York, 278 NY 454), for which the State may be held liable, provided such negligence was the proximate cause of the injuries for which damages are sought. (Lyle v State of New York, 44 AD2d 239; Stuart-Bullock v State of New York, 38 AD2d 626, affd 33 NY2d 418, supra; Le Boeuf v State of New York, 169. Misc 372, affd 256 App Div 798, affd 281 NY 737.)
In the present case there is no doubt that the standing water constituted an unreasonably dangerous condition. (See Bono v State of New York, 1 NY2d 885; Torrey v State of New York, 266 App Div 900, revg 175 Misc 259; see, generally, Ann., 61 ALR2d 425.) The next question, then, is whether the State knew or should have known of this condition. The evidence presented was insufficient to establish that the accumulation of water was caused by the improper construction of the highway in 1932 or its resurfacing in 1956. There is no doubt, however, that water tended to accumulate on the highway, particularly in the area of the Nelson accident, during periods of rain. Moreover, this condition was recurrent, and had existed for many years. The State clearly had actual notice of the condition by reason of the complaints of both Mr. Houghton and Mrs. Hinshaw. Even if the complaints had not been received, certainly the State had constructive notice of the condition because of the long period of its recurrence. This being the case, the State was under a duty to take remedial action.[3] Instead, the only action taken by the State, the construction of the swale in 1974, aggravated the dangerous condition by *112 diverting additional surface water onto the highway. Hence, the court must conclude that the State was negligent in the maintenance of the highway.
The State argues that, even assuming that it was negligent, such negligence was not a proximate cause of the accident. It contends that the sole proximate cause was the negligence of the defendant, Kenneth R. Nelson. Preliminarily, the court notes that there was no evidence that Kenneth R. Nelson was traveling at an excessive rate of speed for the circumstances then existing, or that his vehicle was not in good working order. Further, there was no evidence that a reasonably prudent driver would have observed the standing water within a sufficient time to have avoided it.
The cause for the Nelson vehicle being slightly to the left of the center line, bears closer examination. The claimants contend that the vehicle was diverted to the left by the standing water. The unrefuted testimony of the State’s expert was that, given the circumstances presented here, the vehicle would tend to travel in a straight line and, because of centrifugal force, leave the highway to the right. Presented with this testimony, the court must conclude that it was driver error that caused the Nelson vehicle to travel to the left of the center line. Moreover, it was foreseeable that an attempt to return to the correct lane of travel might cause a vehicle to skid on a wet highway. Therefore, the court must conclude that Kenneth R. Nelson’s conduct constituted negligence and that such was a proximate cause of the accident.
The aforesaid finding, however, does not relieve the State from liability here. The loss of steering control, that occurred upon Mr. Nelson’s attempt to return to his correct lane of travel, was consistent with the condition of standing water existing at the time. Hence, the court must conclude that the standing water was also a substantial factor in the happening of the accident. Although Mr. Nelson’s negligence concurred with the State’s in causing the accident, his negligence was.slight and played only a small part in the series of transactions leading to the claimants’ injuries.
Under the circumstances, the court finds that the State of New York was 90% responsible, while Kenneth R. Nelson *113 was 10% responsible for the accident and the injuries resulting therefrom. No culpable conduct is attributable to the claimant, Gloria A. Nelson, or Sheryl Nelson.
Damages and Award
Present Value Problem :
Before turning to an assessment of damages, the court is faced with the question of whether a present value computation may be utilized with respect to damages that are prospective in nature. Usually, it is the defendant who seeks to introduce such evidence, since its application tends to reduce an award. Here, however, the claimants produced an economic expert who testified with respect to present value.
Although there is some support for the use of present value in arriving at an award (see Cornell v T. V. Dev. Corp., 17 NY2d 69 [action for wrongful discharge]; Randall-Smith, Inc. v 43rd St. Estates Corp., 17 NY2d 99 [action for forcible ejectment]; Hollwedel v Duffy-Mott Co., 263 NY 95 [action for wrongful discharge]; Zaninovich v American Airlines, 26 AD2d 155 [wrongful death]), such a procedure is fraught with problems. The basic premise of present value is that money invested today will earn money in the future. Therefore, when the damages are not immediate, but are reasonably expected in the future, the amount awarded should take into consideration this earning potential. The first problem with this premise is that the earning power of money fluctuates.[4] The second problem is that a party should not be required to wait until the end of a given period of years in order to be compensated for a loss that may be incurred on a periodic basis. Therefore, the computation must take into consideration a periodic payment from the principal sum invested. This periodic payment is not necessarily a fixed sum, since it may be affected by the ravages of inflation. In sum, the computation of present value involves a certain degree of uncertainty aris *114 ing from the difficulties of projecting both future interest rates and inflation.
Despite the foregoing, this court believes that it is proper to apply present value to prospective damages under appropriate circumstances. This is true, even though such an application necessarily involves factors that are not presently ascertainable with absolute certainty. As with all expert testimony, the test is one of reasonable certainty. To satisfy this test there must exist a proper foundation. With respect to the prediction of future events, the foundation must be based upon a statistical analysis of past events. Therefore, in the present case, the evidence must be sufficient to establish reasonably certain trends for both interest rates and inflation. In addition, sufficient information must be presented to explain the mathematical computations used to determine present value. Where appropriate, this computation must take into consideration a periodic pay out from the principal sum.
Here, the foundation for the opinion of the claimants’ economic expert was, for the most part, insufficient. Accordingly, the State’s motion to strike the opinion evidence of the claimants’ expert, with respect to present value, is at this time granted (see Ashdown v Kluckhohn, 62 AD2d 1137; Zaninovich v American Airlines, 26 AD2d 155, supra), and present value will not be considered by this court in making its award. The court will consider, however, the opinion elicited from the claimants’ expert with respect to increased medical costs in the future. This was predicated upon an analysis of cost trends over the past four years and were confirmed by an independent source.
Gloria Nelson — Claim for Personal Injuries :
Gloria Nelson was, at the time of this accident, 40 years of age. At the time of trial, she was 43 years of age. She resided with her husband and her children, Timothy, age 11, Pamela, age 9, and Sheryl, age 7. The Nelsons had been married since June 23, 1956. She had a little more than two years of college education. During her married life and prior to the birth of her children, she had worked at various clerical jobs on a full-time basis. In 1972, she *115 obtained part-time employment as a Welcome Wagon Hostess. This continued until 1976, when she obtained a position as a bookkeeper for the Finger Lakes Pool & Fence Company. In addition to her duties as a bookkeeper, she was required to do sales and secretarial work, including typing and shorthand. She last worked the week of August 6, 1977. At that time, she was being paid $2.75 per hour and was making $103.03 per week.
Subsequent to the accident, Gloria A. Nelson was taken to Tompkins County Hospital and then immediately transferred to Crouse Irving-Memorial Hospital. As a result of the accident, she sustained a contusion of the right temporal and frontal lobes of the brain. An injury to the left side of her brain was found as well. In addition, it was discovered that she had sustained a fracture of the second rib on her left side.[5] A craniotomy was performed to remove a subdural hematoma that had developed on the right side of her brain. Thereafter, a C.T. scan revealed an enlargement of the ventricles of the brain. This was a condition known as hydrocephalus. An attempt was made to relieve the condition by the insertion of a lumbo peritoneal shunt. This initially proved unsuccessful, but the condition subsided sufficiently to allow a cranioplasty to be performed. During this procedure the bone flap previously removed had been reinserted. This later had to be removed when an infection developed and has never been replaced. The aforesaid injury to the brain has rendered the claimant totally disabled. She is currently in a permanent vegetative state, with no hope of improvement. Her life expectancy was considerably shortened and was, at the time of trial, estimated to be 20 . years. She is now receiving 24-hour care at Taylor-Brown Memorial Hospital in Waterloo, New York.
In fixing the damages sustained by Gloria Nelson, a problem exists with respect to the period that the claimant suffered pain and discomfort. Because of her injuries, she was unable to verbalize her pain. Moreover, due to the de *116 struction of her higher brain functions, some doubt exists as to whether she was ever aware of her condition. Notwithstanding, the court feels that there is sufficient evidence to conclude that she did, for a time, consciously suffer. Prior to her initial discharge from Crouse Irving-Memorial Hospital in January of 1978, there were periods when Gloria responded to commands by winking, sticking out her tongue, and squeezing ones hand. In addition, there were times when she was somewhat aware of her surroundings. She was able to follow objects with her eyes and became agitated when her husband and children came to visit. She was at times observed to be moaning in pain and was observed to be scratching at a rash that developed on her legs. In sum, this may be considered sufficient evidence to support a finding that she felt pain during this period. (See Roche v Brooklyn City & Newtown R. R. Co., 105 NY 294.) At the time of her discharge in 1978, she had deteriorated to a vegetative state and the evidence was insufficient that she was able to feel pain thereafter. That, as a result of the aforesaid personal injuries, the court finds that the claimant, Gloria Nelson, has been damaged in the sum of $350,000.
With respect to Gloria Nelson’s claim for lost earnings, consideration was given to her employment potential based upon her educational background and work history. The best indicator of her earning capacity, at the time of the accident, was the actual hourly rate that she was earning at that time. Moreover, Mrs. Nelson had the capacity to work a full work week. Therefore, the court finds that Gloria Nelson’s earning capacity at the time of the accident was $5,357.56 per annum. As of the time of trial, Mrs. Nelson had lost 121 weeks from work and incurred lost earnings in the sum of $12,466.63. With respect to her claim for future lost earnings, the court has given consideration to Mrs. Nelson’s prospects for advancement in the future and her estimated work expectancy, at the time of trial, of 18.2 years. Hence, damages are found for this loss in the sum of $150,000.
Accordingly, the claimant, Gloria Nelson, is awarded the sum of $512,466.63 for all damages sustained as a result of the accident.
*117 Sheryl Nelson — Claim for Personal Injuries :
As a result of the accident, Sheryl Nelson, then seven years of age, sustained the following painful injuries: A comminuted fracture of the proximal phalanx of her left index finger; fracture of the fourth metacarpal of the left hand; multiple minor cuts and nicks to her face, left hand and forearm; and a contusion of the left hand.
Following the accident, she was taken to Tompkins County Hospital, where she received emergency care for her injuries. Although X rays were taken of her left hand, it appears from the hospital record that the fractures were not diagnosed. Her wounds were cleaned and her left hand was bandaged and she was then released.
The next day, she was taken to Geneva Memorial Hospital, where her hand was again X-rayed. As a result, the aforesaid fractures were discovered. Her hand and forearm were then placed in a cast and she was discharged to the care of Dr. Olaf Lieberg. She was thereafter seen by the doctor on two occasions, the last of which was on September 27,1977. At that time, she had completely recovered.
That, as a result of the aforesaid, the court finds that the infant claimant, Sheryl Nelson, has been damaged in the sum of $2,500, and is entitled to an award in like amount.
Kenneth R. Nelson — Claim for Personal Injuries :
As a result of the accident, Kenneth R. Nelson, then 42 years of age, sustained the following painful injuries: Fractures of the left fifth, sixth, seventh, and eighth ribs, with minimal displacement; vertical fracture of the medial portion of the right ilium, with minimal displacement; a three-inch laceration distal to the left knee joint extending to the fascia; cerebral contusion with mild concussion; and superficial lacerations over left chest and arm.
Subsequent to the accident, Kenneth R. Nelson was taken to Tompkins County Hospital, where he was treated for his injuries. Initially, the treatment consisted of bed rest and medication. At this time, ice was placed over his hip. Thereafter, rehabilitative therapy was commenced. A *118 walker and then crutches were employed to assist him in walking. For this activity, his chest was bound by a rib belt. On August 28, 1977 he was discharged from the hospital and placed in the care of his physician. His outpatient care continued until October 24, 1977. He remained on crutches for a period of one month following his discharge. He returned to work, however, on September 5, 1977. Although he presently complains of occasional pain in the area of his right hip, no permanency is claimed. Medical expense in the total sum of $2,862.40 was incurred by Kenneth R Nelson for the treatment of his injuries.
Lost earnings are claimed for time lost from his employment. He asserts that three full days and 36 part days were lost as a result of his injuries. At the time, he was employed as an associate professor at Eisenhower College and was paid for the days that he was absent. For the claimant, Kenneth R Nelson, to recover for his lost earnings, it must be shown that these payments were not gratuitous. (See Drinkwater v Dinsmore, 80 NY 390.) Kenneth R. Nelson testified that he assumed that the source of the payments was sick leave benefits. If this were proven, the lost earnings would be compensable. (See Carroll v Roman Catholic Diocese of Rockville Centre, 26 AD2d 552, affd 19 NY2d 658.) The court finds that the claimant’s assumption, alone, is insufficient to establish that payments were not gratuitous. Hence, this branch of his claim must be disallowed.
Accordingly, the court finds that the claimant, Kenneth R. Nelson, has sustained damages in the sum of $16,000 for his personal injuries and for medical expenses incurred as a result thereof. This sum, however, must be reduced by his 10% pro rata share of culpability. (CPLR 1411.) Therefore, he is awarded the sum of $14,400.
Kenneth R. Nelson — Derivative Claim Arising from Wife’s Injuries :
The claimant, Kenneth R. Nelson, seeks to recover damages for loss of consortium. Although sometimes referred to as loss of services, such claim embraces not only services and support, but also such elements as love, companionship, affection, society, and sexual relations. (Mil *119 lington v Southeastern Elevator Co., 22 NY2d 498; PJI 2:315.) In addition, he seeks damages for past and future medical expenses incurred as a result of his wife’s injuries.
Effective July 19,1980, the husband’s primary obligation to support his wife was abrogated. (Domestic Relations Law, § 32; L 1980, ch 281, § 3.) The support obligations are now mutual and dependent upon the parties’ needs and ability to pay. What effect, then, does this change in the law have on the ownership of a derivative cause of action?
Formerly, such a claim belonged to the husband. This was predicated upon his primary obligation to support his wife and his concurrent right to her services. (See Butler v Manhattan Ry. Co., 143 NY 417.) An exception to the general rule, however, permitted the injured wife to recover for expenses that were incurred on her own credit and paid out of her own funds. (De Fossez o Lake George Mar. Ind., 281 App Div 1002; Dawley v State of New York, 186 Misc 571.) In 1968, the Court of Appeals in Millington v Southeastern Elevator Co. (22 NY2d 498, supra) determined that it was no longer appropriate to deny a wife a cause of action for loss of consortium. The court recognized that since the injury sustained was to the tangible benefits derived from the family relationship, the cause of action for loss of consortium belonged as much to the wife as it did to the husband. The husband’s primary obligation to support his wife was not a significant factor. In sum, a cause of action for loss of consortium could be brought by either spouse without regard to his or her obligation to support the other. Obviously, then, the right of either spouse to bring such a claim is not affected by the new change in support obligations.
What remains to be determined is whether, in light of the new statute, a derivative cause of action for medical expenses may be maintained by the noninjured spouse. Millington v Southeastern Elevator Co. (22 NY2d 498, supra) offers no guidance, since the issue of medical expenses was not addressed. Nor can the rationale of the case be extended to cover the circumstances where medical expenses are incurred. Unlike a claim for loss of consortium, *120 the right to recover for medical expenses depends upon a legal obligation to pay süch expenses. For, absent such an obligation, no interest is impaired and, hence, the party - incurs no damage. Prior to the enactment of the new support statutes, such a cause of action could have been brought by the husband, as the party primarily responsible for his wife’s support. Upon the advent of the new statute, the husband was no longer primarily responsible for the support of his wife. This would suggest that there is no longer justification for a derivative cause of action for medical expenses. Instead, it could be argued that the claim for medical expenses now belongs to the injured spouse.[6] This would logically follow from the fact that should an injured spouse recover from his or her own medical expenses, that spouse would now have the ability to pay such expenses and this would implicitly relieve the other spouse from any support obligation in that regard.
Notwithstanding, this court does not believe that it is inappropriate to allow a derivative claim for medical expenses. For conversely, where one spouse recovers for the medical expenses of the injured spouse, it is now the former who has obtained the ability to pay and who implicitly assumes the support obligations with respect thereto.
Further, the court notes that there would be no danger of duplication. Where both spouses have brought a claim for medical expenses, they will be joined. In such a case any award will be made to the injured spouse, as the person with the primary right to recover for his or her own injuries. Where only one spouse has brought a claim for medical expenses, and the claim has been terminated either by judgment, settlement, or otherwise, the other spouse’s action will be barred. (Cf. Millington v Southeastern Elevator Co., 22 NY2d 498, supra.)
*121 In accordance with the foregoing, the derivative claim of the claimant, Kenneth R Nelson, for loss of consortium and past and prospective medical expenses incurred as a result of his wife’s injuries, will be allowed.
The next question that must be resolved is whether any award hereinafter made on the derivative claim should be reduced by Kenneth R. Nelson’s proportionate share of culpability. Under the former law, where contributory negligence was a complete defense, the derivative action would be barred should either the party primarily injured or the party bringing the derivative action be held negligent. (See Waxenberg v Goodes, 58 AD2d 625; Miller v Rankin, 10 AD2d 695; see, also, Reilly v Rawleigh, 245 App Div 190; Maxson v Tomek, 244 App Div 604.) Subsequent to the enactment of CPLR article 14-A, the cases reported have dealt with only those situations where the party primarily injured was negligent. In such cases, the derivative cause of action was reduced by the proportionate share of that party’s culpability. (See Abbate v Big V Supermarkets, 95 Misc 2d 483; Meyer v State of New York, 92 Misc 2d 996.) This court believes that the award must also be reduced where the party bringing the derivative claim is negligent, by his or her pro rata share of culpability. This is consistent with the principle that a party should not benefit by his own negligence. Further, it is noted that this is the approach taken by the courts of Wisconsin, which State has had a comparative negligence statute since 1931. (See White v Lunder, 66 Wis 563.) Therefore, any award hereinafter made on Kenneth R. Nelson’s derivative cause of action arising from his wife’s injuries will be reduced by 10 %.
The court now turns to those factors upon which the award for loss of consortium will be based. Initially, no consideration will be given to Kenneth R. Nelson’s right to receive support from his wife. This has been subsumed into that portion of the award made to Gloria Nelson for her lost earnings. (See Millington v Southeastern Elevator Co., 22 NY2d 498, supra.) Consideration will be given to the affect of Gloria Nelson’s total disability on the family relationship over the period of Mr. Nelson’s 30.2-year life expectancy, since his life expectancy was shorter than his wife’s, prior *122 to the accident.[7] Consideration will also be given to the age of the Nelson’s three children. Moreover, consideration will be given to the economic value of his wife’s services over this period of time, as established by the entire record. Although a separate claim was made for sums expended for a housekeeper, this will not be allowed, since it is duplicated by the award for loss of services. As a result, the court finds that the claimant, Kenneth R. Nelson, has sustained damages in the amount of $200,000 for loss of his wife’s consortium.
With respect to the derivative claim for medical expenses, the court finds that as of the date of trial, Kenneth R. Nelson incurred bills for his wife’s care in the sum of $125,-804.03. Moreover, there is ample evidence to support a finding that he will incur additional medical expenses for her care in the future over the 20 years she is now expected to live. In making the award for prospective medical expenses, the court has taken into account that the cost of medical care is reasonably expected to increase in the future. The court finds that the claimant, Kenneth R. Nelson, has been damaged in the sum of $370,000 for prospective medical expenses that are reasonably expected to be incurred by him as a result of his wife’s injuries. Therefore, the court finds that the claimant, Kenneth R. Nelson, has been damaged for past and prospective medical expenses arising from his wife’s injuries, in the sum of $495,804.03.
Accordingly, the claimant, Kenneth R. Nelson, has sustained total damages as a result of his wife’s injuries in the sum of $695,804.03. This sum, however, must be reduced by 10%, that being Kenneth R. Nelson’s pro rata share of culpability. Hence, Kenneth R. Nelson is awarded the sum of $626,223.63 for all damages arising from his wife’s injuries.
Kenneth R. Nelson^Derivative Claim Arising from Daughter’s Injuries :
This derivative claim is limited to medical expenses incurred as a result of injuries sustained by Sheryl Nelson, Kenneth R. Nelson’s daughter. In this regard, the proof *123 establishes that medical expenses in the amount of $356.85 were incurred. Hence, Kenneth R. Nelson has been damaged in like amount. The damage, however, must be reduced by the 10% pro rata share of Kenneth R. Nelson’s culpability. Accordingly, the claimant is awarded the sum of $321.17 on this claim.
State’s Claim for Contribution :
With respect to the State’s counterclaim for contribution asserted against the claimant, Kenneth R. Nelson, the State is awarded an amount equal to the excess paid to claimants, Gloria Nelson and Sheryl Nelson, over and above the State’s equitable share (90%) of the judgments to be entered in accordance with this decision. (CPLR 1402.)
Motions :
All motions made at the time of trial, not heretofore determined, are deemed denied.

. Prior to the Nelson accident, it had been raining for 20 minutes. Such localized rainstorms were apparently not uncommon to the area. There was some conflicting testimony offered by the State with respect to the duration of *109 the rain. This was presented by Deputy Sheriff Teeter. At the time of the accident, he was on boat patrol on Cayuga Lake, near the accident site. Some doubt was cast upon his testimony, since he stated that the rain was of sufficient duration to cause his partner to turn on the bilge pumps in the boat. Moreover, the evidence established that water would accumulate on the highway very rapidly during heavy rains.

. At trial, evidence of certain accidents occurring in the area of the Nelson accident was not received. As to others, decision was reserved. Although all of the circumstances surrounding these accidents was not proven, they were sufficiently similar to the subject accident to permit them to be received. Therefore, the State’s motion to strike such evidence is at this time denied. The court notes, however, that this evidence has been given very little weight. Hence, the court’s conclusions, hereinafter found with respect to the State’s liability, are not necessarily dependent thereon.

. This duty was recognized by the State’s own standards in effect on the date of the Nelson accident. (See 17 NYCRR 236.5.)

. There is some authority that statutory interest rates may be used in the computation of present value. This, however, seems to be a rigid approach that may bear no relation to the realities of the investment market. (1966 Report of NY Law Rev Comm, pp 365, 375, 380.)

. Although a seat belt defense has been asserted (see Spier v Barker, 35 NY2d 444), there was no evidence adduced that would tend to establish that the injuries sustained by any of the claimants herein were caused or aggravated by the failure to wear a seat belt.

. This would present no problem with respect to bills paid by Kenneth R. Nelson prior to July 19, 1980, the effective date of the new statute. For, although the prior law is constitutionally questionable (see Orr v Orr, 440 US 268; Greschler v Greschler, 71 AD2d 322), it would provide a basis for the derivative claim until struck down. A problem exists, however, with unpaid and prospective medical expenses, since the current obligation to pay these would be determined under the new statute.

. It is over this period that Kenneth R. Nelson could reasonably have expected to receive the benefit of his wife’s consortium.